IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-91-176-1 |
| | § | CIVIL ACTION NO. H-04-2367 |
| HENRY WILLIAM NUNEZ | § | |
| | § | |
| | § | |
| Defendant-Movant. | § | |

## MEMORANDUM AND RECOMMENDATION

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C.

§ 2255 is Movant Henry William Nunez's ("Nunez") § 2255 Motion to Vacate, Set Aside or Correct

Sentence (Document No. 396),[1] Nunez's Motion Requesting Leave to Amend § 2255 Motion to

Vacate, Set Aside or Correct Sentence (Document No. 399), Notice of Filing (Document No. 402),

Motion for Leave to file Supplement to Amended § 2255 Motion to Vacate, Set Aside or Correct

Sentence (Document No. 403) and  Supplemental Amended § 2255 Motion to Vacate, Set Aside or

Correct Sentence (Document No. 404), Motion Requesting Leave to Supplement § 2255 Motion to

Vacate, Set Aside or Correct Sentence (Document No. 418), and Second Supplement to Amended

§ 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 419), the United States'

Answer (Document No. 411) and Motion for Summary Judgment (Document No. 412), and the

---

[1] Henry William Nunez's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-04-2367 and at Document No. 396 in Criminal Action No. H-91-176.  References hereafter will be to the Criminal Document numbers unless otherwise indicated.

United States' Response to the Court's July 24, 2006, Order (Document No. 432).  After reviewing the parties' submissions, the record of the proceedings before the District Court in the underlying criminal case, and the applicable case law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Movant's Motion Requesting Leave to Amend § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 399) be GRANTED, Movant's Motion Requesting Leave to Supplement § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 403) and Movant's Motion Requesting Leave to Supplement § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 418) both be DENIED, the Government's Motion for Summary Judgment (Document No. 412) be GRANTED on all claims except for Movant's ineffective assistance of counsel claim concerning his request to counsel to file a motion to preserve his appellate rights, which requires an evidentiary hearing, and that Movant's § 2255 Motion to Vacate, Set Aside, or Correct Sentence (Document Nos. 396, 402) be DENIED on all claims except for Movant's ineffective assistance of counsel allegation that he asked his counsel to file a motion to preserve his appellate rights, but counsel failed to do so.  As to that claim, it is FURTHER RECOMMENDED that the Court hold an evidentiary hearing to determine whether Movant instructed his lawyer to file an appeal, which his counsel failed to do.

## I.       Procedural History

Movant William Henry Nunez ("Nunez") who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C. § 2255.  This is Nunez's first attempt at § 2255 relief.

On October 29, 1991, Nunez, David Ramon, Oscar Dario Cardenas, Jose Heli-Mejia, Liliana Nunez and German Cruz were charged in a three count Indictment.  Count one charged all

defendants with conspiracy to possess with intent to distribute in excess of 5 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846.  Count two charged all defendants with aiding and abetting each other to possess with intent to distribute in excess of 5 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 18 U.S.C. § 2.  Count three charged Nunez and his wife, Liliana, with engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. §§ 2, 1957(a)(b)(1) and 3571(b).  (Document No. 1).  Nunez and his wife failed to appear for a hearing, on November 25, 1991, and  bench warrants were issued for their arrest.  (Document No. 41).  Nunez was arrested in May 2002.  The Court appointed attorney Steve Baxley as counsel for Nunez on May 17, 2002.  (Document No. 337).  Unhappy with this appointment, Nunez,  in a letter,  requested different counsel.  At the September 12, 2002, Pre-trial conference, Judge Harmon denied Nunez's oral motion for a new lawyer.  (Document No. 357).  Nunez pleaded guilty to count 1 pursuant to a Rule 11(e)(1)(B) written Plea Agreement.  (Document No. 360, 361, Transcript of Rearraignment Hearing, Document No. 407).  Pursuant to the terms of the written Rule 11(e)(1)(B) Plea Agreement, Nunez agreed to waive his right to appeal the conviction and sentence, except for an upward departure, and agreed to waive his right to collaterally attack his conviction.  The Government, in exchange for Nunez's plea, agreed not to object to a finding by the Probation Department that Nunez accepted responsibility pursuant to U.S.S.G. § 3E1.1(a).  In addition, the Government agreed to dismiss counts 2 and 3, the Notice of Criminal Forfeiture, and the criminal Indictment in Criminal Case No. H-91-61.  Finally, the Government agreed not to charge Nunez with failure to appear.  As to the maximum penalties, calculation of Nunez's sentence, his right to appeal and right to seek collateral review, and factual basis for the plea, the Plea Agreement states:

1.  The defendant, Henry William Nunez, agrees to plead guilty to Count One of the indictment in this case.  Count One charges the defendant with conspiracy to possess with intent to distribute a controlled substance and that the controlled substance is in excess of 5 kilograms of cocaine, in violation of Title 21, United States Code, Section 846.  The penalty for the violation of Title 21, United States Code, Section 846 is a mandatory minimum term of imprisonment of ten (10) years up to life imprisonment, and/or a fine of up to $4,000,000; and a period of supervised release of at least five (5) years....

*               *

4.  The defendant understands that the sentence to be imposed is within the discretion of the sentencing judge.  If the Court should impose any sentence up to the maximum established by statute, the defendant cannot, for that reason alone, withdraw a guilty plea and will remain bound to fulfill all of the obligations under this plea agreement.  The defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed.  Knowing that, the defendant waives the right to appeal the conviction and sentence (or the manner in which it was determined) on the grounds set forth in Title 18, United States Code, Section 3742, except for an upward departure.  This agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).  The defendant is also aware that the United States Constitution and the laws of the United States, including Title 28, United States Code, Section 2255, afford the defendant the right to contest or "collaterally attack' his conviction or sentence after his conviction has become final.  Knowing that, the defendant knowingly waives his right to contest [or] "collaterally attack" his conviction and sentence by means of any post-conviction proceeding.

5.  In agreeing to this waiver, the defendant is aware that a sentence has not yet been determined by the Court.  The defendant is also aware that any estimate of the probable sentencing range under the sentencing guidelines that the defendant may have received from the defendant's counsel, the United States or the Probation Office is a prediction, not a promise, and is not binding on the United States, the Probation Office or the Court.  The United States does not make any promise or representation concerning what sentence the defendant will receive.

6.  The defendant is aware that the defendant's sentence will be imposed in accordance with the Sentencing Guidelines and Policy Statements.  The defendant nonetheless acknowledges and agrees that the Court has jurisdiction and authority to impose any sentence within the statutory maximum set for the offense to which the defendant pleads guilty.

*               *

15.   The defendant will plead guilty because he is, in fact, guilty of the charge contained in Count One of the indictment.  In pleading guilty to Count One, the defendant acknowledges the facts as stated below are true, and were the case to go to trial, the government would be able to prove those facts beyond a reasonable doubt.  The parties further agree that this factual basis **does not include all relevant conduct** that may be considered by the Court for sentencing purposes.

## FACTUAL BASIS

On July 20, 1990, a DEA confidential source spoke with co-defendant Jose Heli-Mejia and arranged a meeting with Heli-Mejia that evening.  Prior to this conversation, the confidential source had received 250 kilograms of cocaine in California to be transported to Houston, Texas.  During the meeting, it was arranged to meet the following morning, July 21, 1990, in a Fiesta parking lot in order to transfer the cocaine to its intended receiver.

On July 21, 1990, DEA agents conducting surveillance on the Fiesta parking lot saw the defendant arrive driving a grey GMC van.  The defendant parked the van, met briefly with Heli-Mejia, and then left in a Mazda with Liliana Nunez and co-defendant German Cruz.  The confidential source and Heli-Mejia got into the GMC van.  The confidential source drove the van to the West Oaks Mall on the westside of Houston.  The confidential source dropped off Heli-Mejia at West Oaks Mall.  DEA surveillance agents inside the mall saw Heli-Mejia briefly meet with the defendant Henry Nunez.  Surveillance agents also saw the defendant, Liliana Nunez and German Cruz together inside the mall.  During this time, the confidential source took the GMC van and met with DEA agents and turned the van over to them.  The DEA agents loaded 250 kilograms of cocaine inside the van, returned the loaded van to the confidential source and the confidential source drove the van back to West Oaks Mall.  When the confidential source arrived at the mall, he parked the van and left.  Surveillance agents saw the defendant, Liliana Nunez and German Cruz drive up to the van in a Mercury Cougar.  German Cruz got out of the Cougar, got into the van, drove out of the mall parking lot followed by the defendant and his wife in the Cougar.  Shortly after, both vehicles stopped at a service station and the defendant and German Cruz attempted to repair a broken tail light on the van.  A Harris County deputy sheriff approached the two and offered to help.  The defendant and Cruz did not respond and each drove away from the service station.  Since the tail light was not repaired, the van was stopped by the deputy sheriff for the traffic violation.  German Cruz was detained and the van towed to the nearest substation.  The Cougar was also followed and eventually stopped by a deputy constable for a traffic violation.  During the traffic stop of Henry Nunez, the van was towed by their location and both the defendant and his wife told the deputy constable that the van was theirs and had been stolen.  Liliana Nunez filed a stolen car report with the Constable's Office.  The cocaine was recovered inside the van.  The van was registered to Liliana Nunez.

The cocaine was taken to the DEA lab for analysis.  A DEA chemist did the analysis and found that it was a total of 250 kilograms of cocaine.  (Document No. 361) (emphasis in original).

At Nunez's September 16, 2002, Rearraignment hearing, the Court engaged in an extended colloquy to ensure that Nunez understood the charges against him, the maximum penalties, the rights he was waiving, the factual basis of the plea, and the manner in which his sentence would be calculated.  (Document No. 360, Transcript of Rearraignment Hearing, Document No. 407).   In particular, with respect to Nunez's understanding of the plea agreement, including the waiver of his right to a direct appeal and to collaterally challenge his conviction and sentence, and the calculation of Nunez's sentence, the following exchanges took place between Nunez and the Court regarding Nunez's understanding of the plea agreement and the consequences of pleading guilty rather than proceeding to trial:

The Court: Have you received a copy of the indictment pending against you, that is the written charges that have been brought against you in this case?

The Defendant: Yes, ma'am.

The Court: And have you gone over those charges and the case in general with Mr. Baxley, your attorney?

The Defendant: Yes, ma'am.

The Court: Do you feel like you understand what it is you've been charged with?

The Defendant: Yes, ma'am.

The Court: Are you fully satisfied with the counsel, representation and advice given to you in this case by Mr. Baxley as your attorney?

The Defendant: Yes, ma'am.

                    *                              *

The Court: Have you had a chance to read over that written plea agreement?

The Defendant: Yes, ma'am.

The Court: Have you talked with Mr. Baxley about that agreement?

The Defendant: Yes, ma'am.

The Court: Do you feel like you understand what it is you're going to be agreeing to in that agreement?

The Defendant: Yes, ma'am.

                  *                    *

The Court: Do you understand all the other provisions of that written plea agreement?

The Defendant: Yes, ma'am.

The Court: All right.  Does that written plea agreement contain all of the promises and assurances that have been made to you in an effort to [ ] persuade you to plead guilty in this case?

The Defendant: Can I talk to my lawyer?  (Conferring with counsel) Yes, ma'am.

The Court: What I want to know is, are there any other oral agreements or any other kind of agreements that didn't get written down in that written plea agreement?

The Defendant: No, ma'am.

The Court: All right.  Has anybody made any different promises to you that didn't get put into the written plea agreement?

The Defendant: No, ma'am.

The Court: Has anyone in any way attempted to force you to plead guilty in this case?

The Defendant: No, ma'am.

The Court: Are you pleading guilty because you are guilty?

The Defendant: Yes, ma'am.

                  *                    *

Mr. Stabe: Yes, Your Honor.  In the plea agreement, the defendant agreed to plead guilty to count one of the criminal indictment, which is the conspiracy count.  The defendant waives his right to appeal and collateral attack, except for an upward departure if the Court were to do that.  The Government agrees not to oppose the finding of acceptance of responsibility under 3E1.1(a), which is two points, if he does in fact accept responsibility, and agrees to dismiss counts two and three of the indictment and the notice of criminal forfeiture. The Government also agrees to dismiss the other pending indictment against the defendant, which is H-91-161, which is before Judge Kent, and agrees not to charge the defendant criminally with failure to appear.

*                                        *

The Court: All right.  That's not right either.  You don't propose to plead guilty to the agreement, you propose to plead guilty to the charges, so that's not right.  That's a fair and accurate summary of the written plea agreement that you propose to enter into today?

The Defendant: Yes, ma'am.

*                                        *

The Court: I want to go over with you now the maximum possible penalties you are facing as a result of your plea of guilty this morning.

You are pleading guilty to Count One, conspiracy to possess with intent to distribute a controlled substance.  The penalty for that crime is a minimum mandatory imprisonment of 10 years up to life and/or a fine of up to $4 million, and along with that prison time and fine there would be supervised release of at least five years, and along with that supervised release, there would be certain conditions of supervised release that you would have to follow.  If you failed to follow those conditions, you could be put back into prison for an additional period of time without any credit for the time that you had already been on supervised release and without any credit for the time that you had already served in prison.  And then there would be a special assessment of $100 for the one count that you are pleading guilty to.

Do you understand that all of those taken together, that is the time in prison, the fine, the supervised release, the conditions of supervised release, and the special assessment, those are the maximum possible penalties you are facing as a result of your plea of guilty this morning?

The Defendant: Yes, ma'am.

*                                        *

The Court: And I won't know until after a probation office has made an investigation of your case and has written a Presentence Report that will assist me in sentencing.

The Defendant: Yes, ma'am.

The Court: And after the report has been made, you and Mr. Baxley will get a copy of that report and Mr. Stabe will also get a copy of that report and each of you will have an opportunity to make any objections that you may have to that written report. Do you understand that?

The Defendant: Yes, ma'am.

The Court: And we will then have a sentencing hearing, and at that hearing I will rule on any objections that may be made to that report.  I will also rule on any motions that may be made, recommendations that may be made, or any other matters that might come to my attention that would have an impact on the sentence that you receive.  Do you understand that?

The Defendant: Yes, I do.

                    *                              *

The Court: Now, it could be that at the conclusion of that sentencing hearing, when I pronounce sentence, I may give you a sentence that is more severe than the one that you and Mr. Baxley may have talked about and estimated that you might get under the Sentencing Guidelines.  Do you understand that?

The Defendant: Yes, ma'am.

The Court: And if the sentence I give you is more severe than the one that you and Mr. Baxley may have estimated that you might get, do you understand that you will not be given an opportunity to withdraw your plea of guilty?

The Defendant: Yes, ma'am.

                    *                              *

The Court: But that by entering into this plea agreement with the Government, do you understand that you will be waiving most, if not all, of the rights that you would have to appeal any sentence that I impose?

The Defendant: I understand that.

The Court: All right.  And that any rights you would have to appeal any sentence I impose would be governed by the terms of the written plea agreement.  Do you understand that?

The Defendant: Yes, ma'am.

The Court: And that goes also for any collateral attacks, such as habeas corpus, that you might want to file to overturn any sentence I impose.  Do you understand that?

*                                    *

The Court: All right.  Mr. Stabe, tell me what it is the government is prepared to prove if we went to trial in this case.

Mr. Stabe: Your Honor, the government would show that back in July of 1990, a DEA confidential source was contacted by one of the co-defendants, David Ramos, and instructed to travel to California to pick up a shipment of cocaine.  The confidential source did, in fact, do that and ultimately picked up 250 kilograms of cocaine in California under the surveillance and supervision of DEA agents there.  The cocaine was destined for Houston.

The informant and the cocaine were both brought to Houston on July 20, 1990, and on that evening the confidential source was contacted by co-defendant Jose Heli-Mejia and arranged a meeting that evening.  During that meeting, between the informant and Mr. Mejia, a further meeting was arranged for the following morning, July 21, 1990, at a Fiesta Store here on Interstate 10 and Blalock in Harris County.

The following morning, on July 21st, DEA agents were conducting surveillance at the Fiesta parking lot.  They observed a gray GMC van arrive.  That van was driven by the defendant, Mr. Nunez.  They observed him get out of the van, he met briefly with Mr. Mejia and then ultimately left in a Mazda with his wife, Liliana Nunez; and co-defendant, German Cruz.

The informant subsequent to that, met with Mr. Mejia in the parking lot and both the informant and Mr. Mejia got into the GMC van that Mr. Nunez had left there, and the informant drove the van with Mr. Mejia to West Oaks Mall, which is on the wast side of Houston.  At West Oaks Mall, the informant dropped Mr. Mejia off at the mall and left in the van.

Surveillance agents at the mall followed Mr. Mejia around.  They eventually saw Mr. Nunez, Liliana Nunez and German Cruz also in the mall.  At one point they saw Mr. Mejia and Mr. Nunez meet briefly inside the mall.  While that was going on, the informant had taken the van and met back with DEA agents, who loaded the 250 kilograms of cocaine into the gray van and the informant returned the van back to West Oaks Mall, leaving the parking lot of the mall.

Once the van was returned, DEA agents outside the mall saw Mr. Nunez and his wife and German Cruz in a Mercury Cougar, saw that car drive up to the van.  Mr. Cruz got out of the Cougar, got into the van; and after that Mr. Cruz drove off in the van, followed by Mr. Nunez and his wife in the Cougar.

A block or two after leaving the van, apparently Mr. Nunez or someone noticed that a taillight was out on the van which had the cocaine, and both the van and Cougar pulled into a service station.  Mr. Cruz and Mr. Nunez got out, attempted to fix the taillight.  A Harris County deputy sheriff, who was working with DEA, drove up and approached them, just trying to engage them in conversation They ignored him and both got into their respective vehicles and drove back off.  Mr. Cruz drove off in the van, never fixing the light.  So he was followed by the deputy sheriff and stopped on the traffic violation, and he was subsequently detained, and arrangements were made to tow the van with the cocaine back to [a] county substation.

Mr. Nunez was also followed, left in a different direction as the van.  He was ultimately seen driving back by the van traffic stop and apparently saw the traffic stop, and he eventually was stopped by a different deputy constable.  As it turns out, he had a bad taillight also, it turns out.  And while stopped on that traffic violation, the wrecker with the van drove by that traffic stop location.  Mr. Nunez and his wife both saw the van being pulled by them– or pulled by the wrecker and advised the deputy constable that that was their van and it had been stolen.

Ultimately, Mr. Nunez, who had a traffic warrant on him, was arrested, also taken with his wife to the substation.  The van is registered in his wife's name, Liliana Nunez.  She filed a stolen auto report with the constable's office.  The agents knew that that was false because they had the vehicle under surveillance.

Mr. Cruz consented to a search of the van and agents recovered the 250 kilos from the van, submitted it to the DEA lab and verified it was, in fact, 250 kilos of cocaine.

No one was arrested on this case at the time in 1990, and they were subsequently indicted in 1991 and arrested.

The Court: Mr. Nunez, tell me in your words what it is you did to commit the crime you're pleading guilty to this morning.

The Defendant: My involvement, ma'am, with the people that I knew.  I knew German Cruz and I was involved with him in certain unlawful activities.

The Court: Pretty much what Mr. Stabe just told us?

The Defendant: Pretty much, ma'am.  (Document No. 407, pp. 3-13, 15-19).

On January 7, 2003, Nunez, having retained new counsel, moved to substitute Mr. George Parnham as his attorney in place of Mr. Baxley.  (Document No. 366).  On January 15, 2003, Judge Harmon granted Nunez' request.  (Document No. 367).

Prior to sentencing, a Pre-sentence Investigation Report ("PSR") was prepared (Document No. 371 and Addendum to PSR, Document No. 389), to which Nunez filed written objections.[2] (Document No. 387).  In addition, Nunez filed a Motion for Downward Departure (Document No. 386), in which he argued for a downward departure based on his kidnaping and three years of captivity in Mexico,  his post-offense rehabilitation as suggested by his being a hard working, law abiding citizen for seven years following his return to the United States, and the potential sentencing disparity between his sentence and the sentences of his co-defendants, especially since he played a less culpable role in the offense than his co-defendants Jose Heli-Mejia or David Ramos, who were each sentenced to 350 months' imprisonment.

Pursuant to the PSR, Nunez' guideline sentencing range was calculated as follows:  (1) In calculating Nunez' base offense level, because Nunez was convicted of 21 U.S.C. § 841(b)(1)(A), and because he was held responsible for 2,685.5 kilograms of cocaine as reflected in the drug ledgers, $33,241,500 as reflected in the money ledgers, $1,157,447 seized at his residence, and 250.01 kilograms of cocaine seized by the DEA in the instant offense, U.S.S.G. § 2D1.1directed a

_____

[2] Nunez objected to factual inaccuracies in the PSR regarding his involvement in the offense. According to Nunez, his role in the offense was that of a money courier and money counter.  In addition, Nunez described his and his family's kidnaping and objected to the reliability of the information in the PSR.   In particular, Nunez objected to the increase to his base offense level for being an organizer/leader as described in ¶ 72 of the PSR.  Also, Nunez objected to ¶ 65, which states that : "he willfully failed to appear as ordered, for a judicial proceeding."  According to Nunez, he failed to appear because  he was kidnaped, at gunpoint, and was held under armed guard for nearly three years.  Finally, Nunez objected to ¶ 76 concerning acceptance of responsibility. According to Nunez, he should have been given a three level reduction for acceptance of responsibility given that the plea agreement provided that the government would not oppose the adjustment and had agreed not to file an additional charge for failure to appear.

base offense level of 38. (2) Because Nunez received larger shares of profit from the drug conspiracy and because Nunez had control over Liliana Nunez, German Cruz, Jules Moor and others, under U.S.S.G. § 3B1.1(a) his offense level was increased by 4 levels. (3) Because Nunez obstructed justice pursuant to U.S.S.G. § 3C1.1, his offense level was increased by 2 levels. (4) With an adjusted base offense level of 44, which became an offense level of 43 pursuant to U.S.S.G. §Ch. 5 Pt. A, comment (n.2) "An offense level of more than 43 is to be treated as on offense level of 43" and with a criminal history category of I, Nunez had a guideline sentence of life imprisonment. (Document No. 371).

The docket sheet shows that on June 5, 2003, attorney Edwin Dee McWilliams filed a Notice of Appearance, which also had been signed by Mr. Parnham, and by Nunez indicating he agreed to Mr. McWilliams' representation at sentencing. (Document No. 388).

Nunez was sentenced on June 6, 2003. (Document No. 384, Transcript of Sentencing Hearing, Document No. 395). He was represented at sentencing by Mr. McWilliams. The transcript of the June 6, 2003, Sentencing Hearing shows that Nunez had no additional objections or matters he wanted brought to the Court's attention, as evidenced by the following exchanges between Judge Harmon, Nunez and Mr. McWilliams:

The Court: Do you feel like you understand everything in the presentence report?

The Defendant: Yes, I do, ma'am.

The Court: Do you have any questions you want to ask about it at this time?

Mr. McWilliams: About the presentence report.

The Defendant: No, ma'am.

The Court: All right. Mr. McWilliams and Mr. Parnham filed a number of objections to the report and we're going to be going over those in just a moment, but I want to

find out from you if you have any objections to the report that Mr. Parnham or Mr. McWilliams did not make on your behalf.

Mr. McWilliams: (to the Defendant) Is there anything else that you and I have not talked about that you want to bring to her attention?

The Defendant: No.  Everything is talked about, ma'am.

The Court: All right.  They brought up all the objections that you would have to the report?

The Defendant: Yes. (Document No. 395, p 3).

As to Nunez's objections to the PSR, the following exchanges took place between Mr.

McWilliams and the Court concerning the calculation of Nunez' sentence:

Mr. McWilliams: Yes, Your Honor.  First of all, Your Honor, let me preface all the remarks that I'll have on behalf of Mr. Nunez today.

I think the Court needs to look at this against the backdrop of what it is.  We're looking at a first offender who has pled guilty to an offense for which he is facing, under the calculations by the probation department, a mandatory life sentence with no right of appeal.  The obvious implication there is that the objections that are filed on Mr. Nunez' behalf, as well as the motion for downward departure, are absolutely crucial to justice in the case.

With regard to our first objection, the objection to the aggravating role computation on behalf of the probation department, the PSR, in its entirety, plainly overstates Mr. Nunez' involvement in this conspiracy.  Mr. Nunez' position has always been steadfast about what the role he played in the conspiracy was.  And, Your Honor, I believe, wholeheartedly, that if you look critically at the allegations in the PSR, specifically the facts, and you judge those against the other statements and your common sense, you can see that the probation department and the Government's position about Mr. Nunez' role – it really doesn't make sense and what he has told you does.

With regard to his role, for instance, a large part of him being attributed as a leader or an organizer of this group comes from testimony – or, actually, not testimony but statements made by two particular individuals, Perry Podaras and Jules Moor.  Perry Podaras was never charged in this.  Jules Moor was a co-defendant who has now been released and is on supervised release.  They made statements regarding Mr. Nunez after he had been kidnapped and taken to Mexico.  It was an opportunistic thing for them to be able to do.  If you look at some of those things they say I think

you can tell that those things don't make any sense and they don't wash with the hard evidence.

Perry Podaras talks about Henry Nunez doing– and it's in the presentence report– doing deals with 75 kilos and as much as 720 kilos in 1988, that he was doing those deals for his own benefit and making money from those deals.  What we do know for sure, hard evidence-wise, is that in 1988 him and German Cruz were pulled over in a rent car couriering half a million dollars.

Now, I don't know– and I have seen— you know, I have seen plenty of drug cases from my experience in the D.A.'s office and I know that this court has seen a number of cases – large drug cases like this one.  I have never known on any occasion where someone who was dealing in 720 kilograms of cocaine as the organizer or leader was also making money as a courier of anything.  I have never once ever seen someone who dealt in as much as 10 or 15 kilograms of cocaine courier anything.  They pay other people to do that.  That's what I am talking about when I tell you that the statements by people like Perry Podaras and Jules Moor do not wash with the hard evidence.

Again, with regard to the hard evidence, every time that Mr. Nunez had contact with law enforcement– there is the 1988 arrest – and forgive me if the dates are difficult for me – the 1988 arrest with German Cruz with the money in the car.  He's couriering money, which is what he has always said was his job, which was his role, which is what he received money for or benefit for from the man known to him as Jorge Zambrano.  I believe the Government–Mr. Zambrano goes by a number of aliases, but I believe the Government has him as Jorge Bernal and possibly Jorge Ramirez, I think at one point.  But, in any event, he's couriering the money then.

The instant offense for which he is charged and here today he is couriering 250 kilograms of cocaine.  Mr. Nunez thought he was going to be couriering money that day.  It turned out that he wound up couriering cocaine.  But the point is he was a courier, not an organizer, leader or dealer.

The probation department falls back on the position that, well, there was at the time of his arrest in 1991 that – and pursuant to a federal search warrant they found well over a million dollars, and the PSR leads this court to believe that that money was somehow under Mr. Nunez' mattress or in his home, that that was his personal money to be used.  Nothing could be further from the truth.  The actual reports and the offense reports will show you that that money was found bundled up in a box in a car, again consistent with couriering money, which is what Mr. Nunez has always said was his role.

The ledgers showing the millions of dollars transacted and thousands of kilograms of cocaine being transacted over an eight-month period– Mr. Nunez has said, "I kept that book for Jorge Zambrano.  I was the money guy.  I recorded the money."  That

makes sense. That's why the ledger's there. What doesn't make sense is why if Mr. Nunez was in the position that he was receiving $33 million over the course of an eight-month period that he has no assets, no bank accounts. There is no evidence of any kind of any of that, nothing that would suggest that he has any personal money whatsoever. He owned at the time one Toyota Supra. One Toyota Supra. There are no vacations. There are no fancy schools for his children, nothing that you would typically see with regard to someone who was an organizer or leader in a massive drug operation.

Specifically, with regard to travel, the people– the other co-defendants who went to trial in this case, who are categorized as manager or organizers and leaders— David Ramos and Jose Hili-Mejia– even just in this one offense there are numerous references to their travel, that they are traveling from Florida to California, to Houston, to New York. Mr. Nunez, first of all, doesn't even appear in this offense until the date they were arrested. Doing what? Couriering. But he never – there is never indication – there is never any evidence that Mr. Nunez ever left Houston, Texas, in the commission of these offenses.

Again, Judge, surely this court has seen a number of cases where people are the Tony Montana's of the world, the organizers/leaders of extensive drug operations. They travel. They go where the business is. They go and they make these deals. Don't you know that, if there would be evidence, there would be audiotapes. There would be bank records. There would be all these things that would show that Mr. Nunez was the organizer/leader that the probation department and the Government want you to believe that he is. But there's none of that. There are only the uncorroborated and unreliable statements of two– one unindicted co-conspirator and one co-defendant who received significant benefits for themselves. And the Court has our objections and the law regarding that and with regard to his role in the offense I just ask you to weigh the hard evidence against what is there. There are no assets, no vacations, no audiotapes of him doing deals. There is no evidence of Mr. Nunez ever dealing cocaine. Every time he had contact with law enforcement he was couriering. Every time.

It just— it doesn't wash. The story that he tells you is the truth.

The Court: Let me ask you this. The probation officer states in the addendum that the role adjustment was not based on information provided by other individuals, but because the preponderance of the evidence shows that Mr. Nunez exhibited [control over] other individuals – that is, specifically [ ] his wife Lillian Nunez, German Cruz, Jules Moor and others – and because the criminal activity was otherwise extensive, as shown by the amount of cocaine and currency in the ledgers, as well as the amount of cocaine seized during the arrest.

Mr. McWilliams: And with regard to that I would specifically say that I understand that the probation department says in that response that it is not based on the

statement of others, but I think clearly it is based on the things that Jules Moor says. For instance, the information that he was in control over Jules Moor specifically. The only person who ever says that is Jules Moor.

German Cruz.  That is an assumption that is made by the probation department, that German Cruz worked or couriered for Mr. Nunez.  There is no evidence whatsoever that suggests that German Cruz worked for or was anything other than a partner for Henry Nunez.  Every time they were found together they were doing the same thing. They were working together.  Again, German Cruz himself, in his statements and to the police, never said that he worked for Henry Nunez at all.  Those are assumptions that are being made that are just factually incorrect—

The Court: If I'm not mistaken, German Cruz went to trial.  He never admitted he was guilty of anything, I believe.  So, I mean, I don't think we can look to that.

Mr. McWilliams: Well, in the presentence report, Your Honor, you can find statements made by German Cruz that acknowledge his guilt in the 250 kilograms of cocaine.  He also didn't tell them that he worked for Mr. Nunez.

Also, Your Honor, something that I would like to point out with regard to things that specifically German Cruz and the things that Mr. Podaras and Mr. Moor attribute to Mr. Nunez– they also said that German Cruz was involved in those transactions, that he was doing those.   And in the presentence report, in Paragraph 62 of the presentence report, that is discussed; and the probation department admits that, as far as German Cruz is concerned, they were never able to verify that those things that those people said about German Cruz was true.  It's just another thing to consider in weighing the reliability of what Jules Moor and German tell you.

There is no question, with regard to ledgers, that this was a – Mr. Nunez worked for what was a very extensive cocaine trafficking operation.  That is not the–his role in it is not extensive.

With regard to his wife, she is his wife.  She's going to be there and going places with him, doing things with him.  It's almost disingenuous to say that he's recruiting or exhibiting control over his wife.  They are together.

As far as exhibiting control, I believe the responses to the objections— the other thing with regard to Objection No. 1 that the probation department responded to is Liliana Nunez, German Cruz, Jules Moor and others, who the "and others" are I still have no idea.  There simply is no evidence that supports any of that that is reliable in any sense.

And, again, if you look critically at the things— look at the instant offense for which he is charged.  There are six or seven pages of that offense being organized, transacted, negotiated, everything, before Henry Nunez' name even appears and,

when it does appear, it's out of the blue when they're expecting Jose Heli-Mejia to be at Fiesta and all of a sudden Henry drives up to bring the van as a courier. Again, it doesn't – the Government's position simply doesn't correspond to the hard evidence in the case.

The Court: Mr. Stabe, response.

Mr. Stabe: Yes, Your Honor. Well, I think the defense probably confuses leadership roles. I mean, you can have varying degrees of leadership, and we're not maintaining Mr. Nunez is the kingpin of this organization, living the high life and high style and all this money and the cocaine belongs to him and is going to him. You have different levels of organization and leadership in this conspiracy, you know, and, as to relevant conduct, that Mr. Nunez did hold an organizer position in the hierarchy and even less than Jose Heli-Mejia, but, nevertheless, that he did.

And while Mr. Cruz didn't make a statement that he worked for Mr. Nunez, if you look at the facts on this particular transaction, Mr. and Mrs. Nunez were at the West Oaks Mall, along with German Cruz, after the van was returned to the mall with the 250 kilos of cocaine in it. This is the van belonging to the Nunez'. Rather than Mr. and Mrs. Nunez picking up that van, they dropped German Cruz off as the driver of that van. Looking at that from an experienced standpoint that, I think, implies and one can presume even there something of a supervisor/management role in that Mr. Nunez is dropping Mr. Cruz off because he has 250 kilos of cocaine and that's one way of distancing yourself from the drugs. Let someone else drive your van with 250 kilos of cocaine. So, I do think there is some hard physical evidence to support that.

Let me also address as far as the informants go. And if the Court needs or feels it's necessary, I do have Agent Kelly Johnson with DEA here, who is the case agent on the case, that would testify to what I'm going to tell the Court. But the Government feels both cooperating defendants were credible in the case of what's referred to as "CI-1" that the defense says was Perry Podaras.

Mr. Podaras testified at trial back in 1992 and, while the Court may not remember everything that was said, his testimony focused on German Cruz. He didn't know the other two defendants. But Mr. Cruz was convicted by the jury, and I would admit to the Court that the conviction, in part, shows that Mr. Podaras and the Government's witnesses were credible.

On top of that, Mr. Moor and – both Mr. Moor and Mr. Podaras' statements we're corroborated by DEA in that they gave details not just about Mr. Nunez but about other drug traffickers that was information known by DEA about traffickers that were under investigation by DEA, identified photographs of other traffickers. In fact, I believe Mr. Podaras identified a photograph of Mr. Moor as someone that he knew that was associated with Mr. Nunez.

So, it's things like that that led the Government to believe and leads the Government to believe that they were credible in providing reliable information.

So, the Government does believe a leadership role is appropriate.

We're not maintaining that Mr. Nunez was at the pinnacle of the leadership role, that all the money was going to Mr. Nunez. Most money back in 1990, 1991 and even today doesn't stay here in the Houston area. It goes back down to Mexico and Colombia.

And whether Mrs. Nunez was kind of under Mr. Nunez' control or direction–the other case where the money was seized that's the subject of the second indictment in this case– in that situation the money was found in a vehicle– I believe a suburban– but what happened in that case was – I don't remember if it was Mr. Nunez– but surveillance was detected and the money – Mr. Nunez, as I recall, directed and gave a statement that he took blame for the money but directed the money be removed from the house where the Nunezes were living and put it in a vehicle to get it out of the house, and that the vehicle– one of the two people in the vehicle was Mrs. Nunez. I believe she was a passenger, not a driver, but she was in the vehicle. And that vehicle was stopped by Customs agents and Houston police officers, and after a consent search, I believe, they found the money or, actually, they could see it in plain view in boxes.

So again, I think there is still – even though she is a wife exhibiting some control, not as a husband-wife but as part of the drug trafficking conspiracy. Now, whether it's four points or three or two, I think he clearly deserves a leadership role.

The Court: What's your next objection?

Mr. McWilliams: Your Honor, Objection No. 2 is objection to paragraph 65 and the computation, the two-point upward adjustment for obstruction of justice for the Defendant's willful failure to appear.

The Court has before it the statements of the two oldest Nunez children, both of whom are there today, and if the Court would entertain hearing from them they would certainly be glad to detail their recollections of those events. But suffice it to say–

The Court: The statements are pretty detailed.

Mr. McWilliams: Yes, ma'am.

Mr. Nunez, shortly after posting bond in the case, was kidnapped by the man he knew as Jorge Zambrano, but the – we could say kingpin, I suppose– was the highest level person in the conspiracy as far as can be determined from what's – all the reports

with regard to these offenses.  He was taken to Mexico.  He was held there for three years.  He was tortured.  He was threatened with his life.  He was threatened with his family's life.

His failure to appear on November the 25th can hardly be called willful.  He was forcibly removed from Houston, taken to Mexico and held there for three years, and not just him, but his wife and his four young children, one of which was an infant at the time.  There is no way you can call that a willful failure to appear.

I understand that in the probation department's responses to those objections they have said that, yes, but after he came back after three years, well, he didn't report to the nearest jail and say, "Hey.  I'm Henry Nunez and I was living under an assumed name."

Well, Your Honor, you have to take into account the fact that he had gone through this experience along with his family.  Mr. Nunez, his wife, his children, still to this day are terrified of George Zambrano.  They live in fear that he or his men will come and find them and take them back to Mexico or kill them on the spot.  Mr. Nunez was terrified of that whenever he got his family back across here.  He took steps to protect them and himself from that occurring.  He split his family up in three separate groups and were separated from his two oldest children for nearly two years in order to protect them from that.

I don't think Mr. Nunez will deny to you that he was concerned that he didn't want to go to jail.  I think that is certainly true, but the foremost concern in Mr. Nunez's mind was the safety and welfare of his family.  He had just been through a three-year ordeal along with his wife and his four children and was terrified.  Again, that conduct can hardly be categorized as willful failure to appear.

*                              *

Mr. Stabe: Well, first of all, the Government can't say whether Mr. Nunez was or wasn't kidnapped.  No information one way or the other.  As the Court is well aware, we know that he wasn't here in court and when agents went to his house there was no one there.

I think probation accurately states the fact that, even had he been convicted, when being released or escaping, whatever the case might be, had he gone to any DEA office in Mexico or the United States and turned himself in relating that story, it might hold more weight than it does now.

I would also like to point out that the marshals prepared a report at the time of Mr. Nunez's arrest back in April of last year, 2002, and while it does say that at the time of his arrest he and his wife stated to the marshals that they had been kidnapped and taken to Mexico in 1991 and threatened that if they cooperated with the police that

they and their children would be killed– but Mr. Nunez also stated that they gave him $5,000 and let him go on the streets of Mexico, which sounds– rings inconsistently with what was filed by the defense presently.

And, thirdly, frankly, it's just very – it would be an exceptional kidnapping like that. I think Agent Johnson would testify to the fact that in drug-related kidnappings the purpose is to find out– gather information about why a shipment of money or cocaine was lost, determine who was responsible. Sometimes someone kidnaps someone in order to get payment for a loss, and if none of that happens and you're not satisfied with that, generally those people are killed. They're not held for three years and, basically, costing a trafficker money to keep them up, house them.

So, frankly, we think that's a little incredulous, that he was held for three years, and I think his statement at the time of the arrest is also somewhat inconsistent.

Even be that as it may, it's kind of one of those costs of doing business as a trafficker that that may happen, but I think of most importance is the fact that Mr. Nunez remained in hiding for another seven, eight, nine years, using an alias name. Even at the time the marshals arrested him his wife and children all denied that he was Henry Nunez to the U.S. marshals, but finally Mr. Nunez admitted it. So, even at the time of his arrest his whole family was maintaining his alias and trying to keep him from being arrested.

                    *                              *

Mr. McWilliams: And Objections 2 and 3, I am sure that Court can tell, are inextricably intertwined. The failure to credit him for– Objection No. 3 is the failure to credit him for acceptance of responsibility in the case. The probation department's sole reason for that is the fact he had qualified for the upward adjustment for obstruction of justice. The fact that we object to that obstruction of justice I think makes the point that we make in No. 3. But the other thing that I would like to point out is in the commentary it doesn't say that the Court can't still grant acceptance of responsibility for someone who had an upward adjustment. It just says ordinarily that would reflect that someone had not accepted responsibility.

In this case– and I think it's also important to know that the Government does not have an objection to– in the plea bargain agreement to a finding that he had accepted responsibility. Mr. Nunez knew from the time he entered into this what he was looking at. I would suggest to you that there is no reason for him to tell you anything other than exactly what he did, exactly what he did. Certainly that has been the advice that he has received from us, and I think that's what he's done.

Mr. Nunez feels incredibly responsible for the agony that he has caused his family and for what he has done to his own life. And given the circumstance that gave rise

to the objection in No. 2 and, therefore, the objection in No. 3, I feel like I have to respond a little bit to the Government's previous statements.

Your Honor, this happened and these people– you read those statements of those two girls. Those are not contrived. Those are vivid memories. And, again, they are here to share that story with you here today in person and you can gauge their credibility for yourself. To suggest that that is contrived is– I can't imagine how hurtful that must be to those children who lived through that for three years. And it did happen and it's not out of the realm of possibility. It is not incredulous at all. And the Government has nothing to say to refute that it didn't happen. Nothing. It's the truth. It is what occurred. What those little girls wrote in those statements is what occurred to them.

And I think that the Court should give some deference to that with regard to Objections 2 and 3 and, again, realizing that we're looking at a – I'll come back to the point that we're looking at a first time offender who is looking at a mandatory life sentence under the calculations provided by the probation department with no right to appeal. With no right to appeal. Given those circumstances, given the unusual scenario that Mr. Nunez finds himself in with the adjustments, I think that the Court would do well to the service of justice to grant him those objections and adjust the role as we have indicated.

                                 *                                *

Mr. Stabe:  – on the acceptance of responsibility because, as defense said, I said in the plea agreement and I meant that I did not object, if the Court finds that Mr. Nunez did accept responsibility, to him receiving the two points off, not three but two. He did plea on the day of the trial as far as us preparing for trial. But just my reasoning on that is, since Mr. Nunez disappeared so early on in the case, back in 1991, when he was re-arrested we pretty much started anew on the case; and I felt then, when I did the plea agreement, that if he did accept responsibility that it would not be inappropriate and I wouldn't object to it happening, to him receiving that, while I still believe that he should also receive the obstruction of justice. So, those are just my thoughts on that, Your Honor, or my rationale.

The Court: All right. Let me say, first of all, that his kidnaping thing– I don't know whether it happened or not. I don't think that the statements by the two children are contrived. I think that they are recording what they recall. One of them I remember said that she had to delve back into her memory to recall it because it was so painful, and it did happen a long time ago and they were very young when it happened. So, we have to look at it through those lenses as well. And I think that everything that they say in their statements are perfectly consistent with the situation in which they are taken by someone out of their house and into Mexico, whether it was a kidnaping or whether it was some friend of family taking them away because their parents were going to abscond. I don't know. I don't know. I mean, it was very scary for them,

and I can– and they spent a lot of time describing what it was like when their father was arrested, and I'm sure that was their impression and it was very scary and horrifying fo them, and I think they're perfectly truthful statements, but I don't think that either one of them had any idea of whether they were really kidnaped or not.

They were in Mexico, hiding from the law, perhaps hiding from this other person, this drug dealer who kidnaped their father, and it was unpleasant and scary and that's what those statements tell me.  Certainly, something happened to them before court began on that Monday morning when their parents were supposed to show up and we were going to continue that hearing on the bond.

Okay.  Having said that, if Mr. Nunez had been kidnaped and kept in Mexico for three years– I agree with Mr. Stabe– he would have, after being released, gone – he should have gone to the authorities.  I think the law is very clear on that.  And the fact that he was afraid for his family, but, you know, you have to weigh those things.  Either you're afraid for your family and you don't go or you're obstructing justice.  I mean, he was gone forever and he was only found living under an assumed name.  So, I just can't give him any sympathy for that, and I can't say I don't think he was obstructing justice by hiding out from the law.

The issue on whether he was a manager.  The probation officer works for me.  The probation officer does not work for the Government.  The probation officer reviewed the files, interviewed agents, did all of the things probation officers do in every case and determined that the sources were credible, the sources were accurate and that Mr. Nunez was in control of his wife– I don't think there is any question about that– that he was in control of German Cruz and Jules Moor.

And, so, I am going to object–overrule your Objection No. 1, overrule your Objection No. 2.

And then as far as receiving credit for acceptance of responsibility, not only in my mind do we have the issue of the obstruction of justice, but we have the fact that, if you read Mr. Cruz's– I mean Mr. Nunez' statements, they are minimizing what he did.  He said he was just a courier, and I think it's clear from all the evidence that's in the presentence report, all the evidence in the trial, that he was not just a courier.  And, so, I am going to overrule your Objection No. 3.

Now, I am going to adopt the findings of the presentence report as my own, both the findings of fact and the application of the Guidelines to the facts, find a total offense level of 43, criminal history category of I, which gives a provision range of life.

Let me say something about this criminal history category of I.  You're correct.  This is his first offense, but it's not as if it's like the first time you ever got stopped for a traffic ticket or the first time you ever got stopped burglarizing a house.  This man is a drug dealer.  He's been a drug dealer for years and years and he just managed to

get caught.  So, that criminal history category I does not cause me to have any sympathy for him on that front.

*                              *

I don't find that his case is outside the heartland, that there is unwarranted sentencing disparity given the circumstances of this case, and I am going to deny your motion for downward departure.   (Document No. 395, pp. 4-25, 27).

In addition, Nunez was afforded the opportunity to speak before his sentenced was pronounced by

the Court.   Nunez' statement follows:

The Defendant: I'm sorry.  I'm sorry for destroying your lives.  I tried hard to [k]eep you guys together.  I'm sorry.

Your Honor, I want to apologize to the Court and the Government.  I would like to let you know that the role that has been given to me right now– I don't understand it, but that's the way the court works.  I have no knowledge of it.

My parents didn't raise me to be a drug dealer all my life, and what I was trying to do is trying to keep my family together all this time.  And I know I did a mistake in my life, three years of it, and I thought by doing that I was going to keep my family up to date with everything they needed and solve my situation, my financial situation, but I know I did a big mistake and I'm sorry for it.

I met this person that somehow I was lured into his believing that everything is going to be okay.  And I know it's hard for me to explain to you right now that I was kidnaped with my family and, you know, trying – like Mr. Stabe said, you know, if nobody killed you in three years it's because Mr. Stabe– I don't mean to offend him or anything– but nobody knows what I went through to keep this person from doing any harm to us.  In other words, I tried hard to keep up with this person.

And I'm just sorry for everything that's been happening, the Court's time and all this thing.  I only wish I could have turned myself in sooner and not abandoned my family and tried to, you know, do it on my own.  And I probably knew that, like Mr. Stabe said, I could have gone to any agent, DEA agent in Mexico, but I was most of the time with these people close.  I was at times away from my family and they were abandoned, and there were times that I would think I would come back to nobody or they wouldn't see me again.  I never killed anybody.  I never kidnaped anybody.

Other than that, Your Honor, I did [know] that it was money that I was transporting for drugs.  I never denied it then.  Yes, there was a conspiracy on 250 kilograms, and that was the reason that I was taken to Mexico, because this man thought that I had talked to the Government about those 250 kilos.  And the reason German Cruz did

> that run, because somehow they knew that they could lure him into the 250 kilos, because I would not have done them, and I would not have lent my van for that progress, Your Honor.
>
> And that's all I can say right now, Your Honor.  I have no more words right now, just..... (Document No. 395, p 28-30).

Nunez was sentenced to life imprisonment, to be followed by a five year term of supervised release.

In imposing this sentence, Judge Harmon stated:

> Mr. Nunez is considered to be a leader/organizer of an extensive cocaine conspiracy in Houston, Texas, during the late 1980s and early 1990s.  He has been involved in the distribution of over 2,500 kilograms of cocaine and over $34 million of drug proceeds.  Mr. Nunez has been a fugitive from justice for the past ten years.  He has a previous conviction for attempted criminal trespass and reports having no recent history of drug abuse.
>
> The Guidelines call for a sentence of life term of imprisonment, and the sentence would meet the sentencing objectives of deterrence, incapacitation and punishment and appears to be an adequate sanction.  (Document No. 395, p. 30).

Also, the Court imposed a special assessment of $100.  (Document No. 384, Transcript of Sentencing Hearing, Document No.395, pp. 30-31).  Judgment was entered on June 23, 2003. (Document No. 390).

On June 18, 2004, within one year of his conviction being final, Nunez timely filed a § 2255 Motion to Vacate, Set Aside, or Correct Sentence (Document No. 396).  In this § 2255 motion, Nunez alleges that he entered his guilty plea involuntarily and unknowingly based on ineffective assistance of counsel.  According to Nunez, his first attorney, Mr. Baxley, was ineffective because he did not want to prepare for trial and instead pushed Nunez to accept a plea, even though Nunez maintained his innocence.  Nunez alleges that Mr. Baxley only met with him on 3 or 4 occasions, would not review the discovery with him, failed to inform him of the nature of the charges, the maximum penalties and the applicable law.  Instead, Nunez contends that he was told by Mr. Baxley that "the government was willing to enter a 'special plea', which would provide for a three level

reduction for acceptance of responsibility, that the government would not move to enhance his sentence or charge him with bond jumping." As to his allegations of ineffective of assistance of counsel claims concerning Mr. Parnham and Mr. McWilliams, Nunez alleges he told Mr. Parnham he wanted to withdraw his guilty plea. In addition, Nunez claims he was prejudiced when Mr. McWilliams represented him at sentencing instead of Mr. Parnham. According to Nunez, he was not notified about the change in counsel and was pressured to agree to the substitution. In addition, Nunez contends that the objections to the PSR were untimely filed. Lastly, Nunez alleges that he asked Mr. McWilliams to file a notice of appeal, which was not done. In support of his ineffective assistance of counsel allegations, Nunez has attached as an exhibit to his § 2255 motion, his affidavit, in which he states, in pertinent part, as follows:

> 8. Attorney Steven Baxley was not providing effective assistance of legal counsel. He never discussed even the possibility of a trial and even went as far as suggesting that I "turn in" my wife, who never had anything to do with my legal problems. Not once did I review discovery with him, nor did he ever sit down with me and discuss the merits of the government's case or even the merits of my case with me. Attorney Steven Baxley never even reviewed the discovery with me in detail, nor did he even discuss the prospects of filing any pre-trial motions on my behalf, such as a motion to suppress, etc. Attorney Steven Baxley was only interested in discussing cooperation and my pleading guilty. I can recall Steven Baxley getting very agitated with my insistence on going to trial.

> 9. Attorney Steven Baxley never once sat down and reviewed with me the charges filed against me, or what the government had to prove to successfully win at trial. Attorney Steven Baxley also never educated me in the case law and how it applied to the specific facts of my case. Although I always asked attorney Steven Baxley what his defense would be, and he outright stated "none-because this will resolve itself." At this time attorney Steven Baxley also told me that "juries are made up of working -class idiots who are going to understand the law no better than you are, and they will convict you just because you are a Colombian national."

> 10. As trial approached I became very nervous because nothing was being done. I remember seeing other individuals who were going to trial preparing with their attorneys at the jail and discussing such matters as the potential defense witnesses that should testify, and the ways in which to impeach the government witnesses and prove they were lying. None of these preparations were ever done by attorney Steven

Baxley.  I distinctly recall requesting attorney Steven Baxley to file a motion to dismiss, as I always consistently told him I was innocent and wanted to fight, but attorney Steven Baxley was very sarcastic and told me I was "spinning my wheels" because my case would not be dismissed. That may have been true, but I think as an attorney Steven Baxley had a duty to at least try and defend me.

11.  Since attorney Steven Baxley only wanted to discuss the possibility of a plea, I felt we were always at odds and that my own attorney was working against me.  After going back and forth for some time, I asked the Judge in my case, the Honorable Melinda Harmon, to appoint another attorney because attorney Steven Baxley was doing absolutely nothing.

12.  Unfortunately, I believe the Judge may have been under the impression that I was trying to be difficult, so the Court did not permit me to have another attorney.

13.  I do not know why, but there was a part of me that believed that now that I had lodged a complaint against attorney Steven Baxley, he would now want to work, since I am sure he did not want to look bad in front of the Judge.  Well, much to my surprise I was wrong, and after I lodged the complaint against attorney Steven Baxley, everything took a turn for the worse.

14.  Now, I felt attorney Steven Baxley was totally against me and I was back at square one with an attorney who now hated me and who simply refused to adequately represent me.  I have never felt so alone in my life.  I am not an attorney, and here I was, fighting for my life alone because my court appointed attorney refused to work and only wanted to explore the prospects of a plea.  One day in particular I asked attorney Steven Baxley if he was going to have the court appoint an investigator, so that we could try to obtain evidence that may exonerate me, and I distinctly remember attorney Steven Baxley looking at me like I was crazy and staying "no, why would I do that?"

15.  As the trial date approached, I became very stressed because I was totally in the dark and was expected to depend on someone who I believed had an intense dislike for me and had no desire to work my case as an attorney should.

16.  At some point in July (maybe a little later, but I know it was after I complained to Judge Harmon about attorney Steven Baxley) Steven Baxley came to the jail and told me that if I was willing to give-up on trial, then the government would be willing to offer me a special kind of plea deal that operated as a contract between myself and the government and which could not be changed by the Court if it was approved by all the parties.  Once again, a day or so before trial was to start, and even on the day trial started, attorney Steven Baxley repeated the offer from the government whereby they would agree to give me this supposed "special plea deal." Since I know nothing about the law, I assumed it was true because I did not think an attorney could be

crazy enough to make something up that was not true or which did not exist in the law books.

17.  On the day trial was suppose to start Attorney Steven Baxley told me it was still not too late to take the special plea and he insisted that the government would now also be willing to give me three points off for my acceptance of responsibility, even though, according to attorney Steven Baxley, I had made the government prepare for trial.  Attorney Steven Baxley also told me if I did not go to trial the government would also be willing not to enhance me for being a fugitive and jumping bond.  At this time attorney Steven Baxley insisted that this was a "miracle" and I should immediately accept the offer.  I then asked attorney Steven Baxley what he thought I should do?  I asked him what would happen if I went to trial and lost as opposed to what I would receive if I entered a guilty plea.  At that time attorney Steven Baxley represented to me that if I lost at trial, in his own words, "I would never see the light of day again," but if I accepted the plea, I would serve a minimum mandatory sentence of ten (10) years followed by supervised release.  Attorney Steven Baxley explained that it was a "miracle" that the government was offering this, and I should therefore jump at it.  At this time I believed attorney Steven Baxley because after all, he was an officer of the Court and I could not imagine that he would have misrepresented the facts so severely.  Maybe he just did not know the law because he is a terrible attorney?  I do not know.

18.  At this point, Steven Baxley quickly told me that the Judge would be asking me some questions about my plea.  He also told me not to worry because the questions the judge was going to ask were simply standard operating procedure that was done in all cases, but that it did not specifically apply to me.  Attorney Steven Baxley told me I would be receiving the benefit of a plea deal that would bind the office of the United States Attorney and myself, and that the Court did not have decision making authority in that type of plea, so I remember he said– do not worry about anything, "that is what you are getting–the ten."  I still was not happy with the ten, but since I was stuck with an attorney the Court did not let me change, and because I knew he could not be ready for trial because we did absolutely no work together, I believed what attorney Steven Baxley told me.

19.  After I plead guilty I was in a total panic about the ten (10) years and I felt I had done the wrong thing out of fear, a lack of understanding of the law, and because I was totally in the dark about my case– including the discovery, the witnesses, what my defense would be, and what the law was or what my potential sentence would be.

20.  Believing that there was still a chance to maybe undo the ten (10) year sentence I had accepted by entering a guilty plea (or so that is what I [thought] I was accepting), my family pooled together some money and hired attorney George Parnham to represent me.  I was very happy at this point because I had heard a lot about him.  And, when I met attorney George Parnham I remembered asking him if we could undo what attorney Steven Baxley had done.  I then explained the

nightmare I had experienced with attorney Steven Baxley. Unfortunately, attorney George Parnham informed me that I could not withdraw my plea under the law because my previous attorney had "fouled things up" and waived my rights to do so.

21. I guess I was on a streak of bad luck because unfortunately, attorney George Parnham did no better than attorney Steven Baxley. Attorney George Parnham only came to see me on one or two occasions before my sentencing. Attorney George Parnham did not even review my PSI report with me. Attorney George Parnham did not even file the PSI objections and another motion for downward departure until the day right before my sentencing.

22. The biggest shock was when the day of my sentencing attorney George Parnham did not even bother to show up. I could not believe it. Instead, attorney George Parnham sent his associate, attorney Edwin Dee McWilliams to represent me at sentencing. But my family did not hire attorney Edwin Dee McWilliams, they hired attorney George Parnham. But on the day of sentencing attorney Edwin Dee McWilliams simply told me that George Parnham was unavailable, and then told me that if I did not sign a paper approving his (attorney Edwin Dee McWilliams) representation at sentencing, I would have to represent myself. I pleaded with attorney Edwin Dee McWilliams to have the sentencing continued, but attorney Edwin Dee McWilliams indicated the sentencing could not be continued. Fearing that I would be left alone and fed to the wolves, right before I was to be sentenced, I signed the paper provided to me by attorney Edwin Dee McWilliams.

22. Needless to say, when I heard Judge Harmon pronounce a life sentence, I truly wanted to die on the spot. Subsequent to the sentencing and before I was taken back to jail, I asked attorney Edwin Dee McWilliams if there was anything that I could do and he said no– I asked him to please file a motion to preserve my appellate rights because I know my family would try and find me the best appellate attorney, but Edwin Dee McWilliams turned to me and told me that "I needed to blame my previous attorney because he waived my appellate rights." I almost fainted when I heard this.

24. Please realize that I am not an attorney and that I relied entirely on my attorneys to represent me and tell me what was going on. I know that this sound incredible, but every time I went to Court I was so nervous and I felt that I understood nothing that was going on. I even can recall the day trial was to commence, and after I signed the plea agreement I asked attorney Steven Baxley "what just happened ... please explain to me what the Judge just said and the implications of what just took place," but attorney Steven Baxley looked at me and told me not to worry. Until the present day I still do not understand how the supposed ten year sentence I was going to receive and which "could not be enhanced" turned into a life sentence? I still do not understand how it is possible for the government to go back on their word, which was reflected in a contract, and refuse to give me acceptance of responsibility when they told me that I would? If I would have known that my attorneys were lying to me at

the time, I would have stood up in the middle of the Courtroom and in the loudest voice, I would have let the Judge know what had been told to me.  But by the time I realized what had been done to me, it was too late, and now I feel my voice no longer matters to the Court.  I would like the Court to know that if I had known what the law was in relation to the facts of my case, and if I had known I would have been entering a guilty plea to a life sentence, I would have even represented myself if I had to– but I would have never entered a guilty plea.  But my lawyers NEVER provided me with the legal counseling they were supposed to, so I ended up making an ignorant, uninformed decision that was induced by lies.  (Document No. 396, Exhibit 1).

Thereafter, Nunez filed a Motion Requesting Leave to Amend his § 2255 Motion (Document No. 399), in which Nunez requested that he be allowed to amend his § 2255 motion to add the transcript of his Sentencing Hearing as an exhibit.  The undersigned Magistrate Judge finds Nunez' request is well taken and is GRANTED.  On July 7, 2004, Nunez filed a Notice of Filing (Document No. 402), including a copy of the sentencing transcript.

On July 7, 2004, Nunez filed a Motion for Leave to File Supplement to Amended § 2255 motion (Document No. 403).  In that motion, Nunez requested leave to amend his § 2255 motion to argue that his sentence enhancement was unconstitutional in light of *Blakely v. Washington*, 542 U.S. 296 (2004).  On December 30, 2005, Nunez filed Motion for Leave to File Supplemental § 2255 motion (Document No. 418), in which he requested leave to amend his § 2255 motion to argue that his sentence enhancement was unconstitutional in light of *United States v. Booker*, 543 U.S. 220 (2005).

The Government, in response, filed an Answer and Motion to Dismiss.  (Document Nos. 411, 412).  According to the Government, Nunez's § 2255 Motion to Vacate, Set Aside or Correct Sentence should be dismissed because Nunez, as part of his written Plea Agreement, knowingly and voluntarily waived his right to collaterally challenge his conviction.  Because the Government did not address Nunez' ineffective assistance of counsel allegation concerning his request to Mr.

McWilliams to protect his appellate rights, the undersigned Magistrate Judge ordered Government to respond to Nunez' allegations. The Government has responded to the Order (Document No. 432). According to the Government, the record shows that Nunez voluntarily and knowingly waived the right to appeal and as such, Nunez' counsel was not ineffective for filing to file an appeal. In the alternative, the Government argues that in light of the undersigned Magistrate Judge's Order, which cites to Nunez' affidavit, wherein Nunez avers he requested Mr. McWilliams to file a motion to protect his appellate rights, but that Mr. McWilliams advised him that he had waived his right to appeal as a condition of his plea agreement, an evidentiary hearing would be appropriate to determine whether Nunez instructed Mr. McWilliams to take whatever steps necessary to preserve his right to appeal and whether Mr. McWilliams consulted with him about an appeal.

## II. Discussion

### A. Motions to Amend

On July 7, 2004, Nunez filed a Motion Requesting Leave to Supplement Amended § 2255 motion (Document No. 403), and on December 3, 2005, a Motion Requesting Leave to Supplement Amended § 2255 motion (Document No. 418) in both of which he suggests that he should be allowed to argue that his sentence enhancement was unconstitutional in light of *Blakely v. Washington*, 542 U.S. 296 (2004) and *United States v. Booker*, 543 U.S. 220 (2005).

Federal Rule of Civil Procedure 15 governs amended and supplemental pleadings, and the law is clear that Rule 15 applies to amendments of § 2255 motions. *See United States v. Saenz*, 282 F.3d 354. 356 (5th Cir. 2002) ("Every circuit that has addressed this issue agrees the [AEDPA's] one year statute of limitations does not render Rule 15 inapplicable to federal habeas proceedings."). "Under Fed.R.Civ.P. 15(c), a district court may in its discretion, permit an amendment which

clarifies or amplifies a claim or theory in a timely filed § 2255 petition after AEDPA's one year statute of limitations has expired." *United States v. Thomas*, 221 F.3d 430, 433-434 (3rd Cir. 2000). Conversely, an amendment under Rule 15(c) should not be allowed where the movant seeks to add an entirely new claim or new theory of relief. *Id.* "An amended habeas petition does not relate back (and thereby escape AEDPA's one year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*, 545 U.S. 644 (2005). Because *Blakely/Booker* is a new theory of relief, supported by facts that differ in type and time from his original § 2255 motion, Nunez is not entitled to amend his § 2255 motion under Rule 15.

Moreover, even assuming that Nunez's claim under *Blakely/Booker* related back to his § 2255 motion, Nunez should not be allowed to amend his original § 2255 motion because *Blakely/Booker* does not apply retroactively to cases on collateral review. As a result, the proposed amendment would be futile.

Nunez argues that the district court's sentencing determination is contrary to the Supreme Court's decisions in *Blakely v. Washington*, 542 U.S. 296, 524 S. Ct. 2531 (2004) and *United States v. Booker,* 543 U.S. 220 (2005) because the Court, and not a jury, enhanced his sentence. In *Blakely*, the Supreme Court invalidated the State of Washington's sentencing scheme, whereby a judge could possibly sentence a defendant to a punishment beyond a statutory range on the basis of judicially determined facts. *Id.* at 2538. In doing so, the Supreme Court applied the rule in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 2363 (2000), which requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The Supreme Court

in *Blakely* expressly declined to state whether its decision applied to the Federal Sentencing Guidelines. *Id.*

The Supreme Court, in its intervening decision, *United States v. Booker,* extended its holding in *Blakely* to the Federal Sentencing Guidelines, and concluded that there was "no distinction of constitutional significance between the Federal Sentencing Guidelines" and the state sentencing scheme at issue in *Blakely* and, in keeping with its earlier decision in *Apprendi*, stated: "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.,* 125 S.Ct. at 756. To remedy the guidelines' Sixth Amendment problem, the Supreme Court severed and excised 18 U.S.C. § 3553(b)(1), which required mandatory application of the guidelines. *Id.* at 756-57, 765. As a consequence, the guidelines are now advisory in all cases. *Id.* at 757. Because *Blakely* and *Booker* were decided after Nunez' conviction in the instant case became final, it must be determined as an initial matter whether *Blakely/Booker* should be retrospectively applied. The Supreme Court has not stated whether the rule announced in *Blakely* and *Booker* applies retroactively to cases on collateral review.[3]   However, the Fifth Circuit addressed this issue as to initial § 2255 motions, and has concluded that *Booker* does not apply retroactively to initial § 2255 motion. *United States v. Gentry,* 432 F.3d 600 (5th Cir. 2005). Because *Booker* does not apply retroactively in initial § 2255 proceedings, Nunez is not entitled to relief in this proceeding on his *Blakely/Booker* claims and his Motions (Document Nos. 403 and 418) should both be DENIED.

B. Waiver

---

[3] The United States Supreme Court has granted *certiorari* in *Burton v. Waddington*, 142 Fed. Appx. 297 (9th Cir. 2005), *cert. granted*, 126 S.Ct. 2352 (June 5, 2006) and will address the issue of *Blakely* retroactivity.

A defendant's waiver of his statutory right to collaterally challenge his conviction with a motion to vacate, set aside or correct sentence under 28 U.S.C. § 2255, like a waiver by a defendant of his right to appeal, is generally enforceable if the waiver is both knowing and voluntary. *United States v. Wilkes,* 20 F.3d 651, 653 (5th Cir. 1994) (Enforcing defendant's voluntary and knowing waiver of § 2255); *United States v. McKinney,* 406 F.3d 744, 746-47 & n.5 (5th Cir. 2005) (Enforcing, post-*Booker*, a waiver of appeal right that was signed prior to the issuance of *Booker).* In addition, such waivers do not "preclude review of a sentence that exceeds the statutory maximum." *United States v. Hollins*, 97 Fed. Appx. 477, 479 (5th Cir. 2004).  In the context of a plea agreement waiver, a sentence exceeds the statutory maximum only when it exceeds the maximum allowed by statute.  *United States v. Bond*, 414 F.3d 542, 546 (5th Cir. 2005); *United States v. Cortez*, 413 F.3d 502, 503 (5th Cir.), *cert. denied*, 126 S.Ct. 502 (2005). When, however, a defendant alleges that his counsel was ineffective in negotiating a plea agreement, such ineffectiveness claims are not barred by the waiver.  *See United States v. White,* 307 F.3d 336, 343 (5th Cir. 2002) ("[i]neffective assistance of counsel argument survives a waiver of appeal only when the claimed assistance directly affected the validity of that waiver or the plea itself."); *United States v. Cockerham,* 237 F.3d 1179, 1187 (10th Cir. 2001) ("[W]e hold that a plea agreement waiver of postconviction rights does not waive the right to bring a  § 2255 petition based on ineffective assistance of counsel claims challenging the validity of the plea or the waiver.  Collateral attacks based on ineffective assistance of counsel claims that are characterized as falling outside that category are waivable."), *cert. denied*, 534 U.S. 1085 (2002); *DeRoo v. United States*, 223 F.3d 919, 924 (8th Cir. 2000) ("A defendant's plea agreement waiver of the right to seek section 2255 post-conviction relief does not waive defendant's right to argue, pursuant to that section, that the decision to enter into the plea was not knowing and voluntary because it was the result of ineffective

assistance of counsel."); *Mason v. United States,* 211 F.3d 1065, 1069 (7th Cir. 2000) (where the ineffectiveness claims raised in a § 2255 motion relate to counsel's performance at sentencing, the defendant's plea agreement waiver of this right to challenge his conviction in a § 2255 proceeding is enforceable), *cert. denied*, 531 U.S. 1175 (2001).[4]   Ineffective assistance of counsel claims, including challenges to counsel's performance at sentencing, which do not relate to the validity of the Plea Agreement and waiver, can be waived.   *White,* 307 F.3d at 343.   Otherwise, "[i]f all ineffective assistance of counsel claims were immune from waiver, any complaint about the process could be brought in a collateral attack by merely challenging the attorney's failure to achieve the desired result.   A knowing and intelligent waiver should not be so easily evaded."   *White,* 307 F.3d at 344.

Here, pursuant to a written Plea Agreement, Nunez waived his right to appeal, including the manner in which his sentence was determined, and waived his right to collaterally attack his conviction and sentence.   As discussed above, the Plea Agreement was explicit with respect to the waiver of the right to appeal and to pursue collateral relief. (Document No. 361, ¶ 4-6).   Also, the Plea Agreement was explicit that Nunez's sentence had not been determined by the court and that

---

[4] There are some other limited situations in which a plea agreement waiver of the right to seek collateral review under § 2255 is not enforceable, such as where the sentence imposed violates the terms of the plea agreement, the sentence is illegal, or the Government has suppressed exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83 (1963).   *See DeRoo*, 223 F.3d at 923 ("defendants cannot waive their right to appeal an illegal sentence or a sentence imposed in violation of the terms of an agreement"); *United States v. Baramdyka,* 95 F.3d 840, 843 (9th Cir. 1996) ("the waiver of a right to appeal may be subject to certain exceptions such as claims involving a breach of the plea agreement, racial disparity in sentencing among codefendants or an illegal sentence imposed in excess of a maximum statutory penalty"), *cert. denied,* 520 U.S. 1132 (1997); *United States v. Hollins*, 97 Fed. Appx. 477, 479 (5th Cir. 2004) (Waiver does not preclude review of a sentence that exceeds the statutory maximum).   None of those circumstances is at issue in this proceeding.

any estimate of the probable sentence range that Nunez may have received was a prediction, not a promise.  (Document No. 361, § 5).

In addition, at his Rearraignment on September 16, 2002, the Court engaged in an extended colloquy to ensure that Nunez was competent to participate in the Rearraignment proceedings, had discussed the plea agreement with counsel and understood the agreement, that no promises had been made to induce his plea, that he understood the offense to which he was pleading guilty, the maximum sentence he faced, and the rights he was giving up by virtue of his guilty plea. The Court also advised Nunez that his sentence could not be determined until a presentence investigation had been completed, and that Nunez could not withdraw his guilty plea if he determined that he did not like the sentence the Court imposed.

Given Nunez's statements on the record, which carry a strong presumption of verity, *Blackledge v. Allison,* 431 U.S. 63, 74 (1977), that he had read and discussed the written Plea Agreement with his counsel, that he understood the statutory and constitutional rights which he was waiving, that he understood his possible range of punishment and how his sentence would be computed, and that he understood that he had waived his right to appeal and to file a post conviction proceeding, Nunez has not shown that his plea was not counseled, knowing and voluntary, and upon this record, Nunez's plea agreement waiver of his right to collaterally attack his conviction with a § 2255 motion is enforceable. Nunez's sentence does not exceed the statutory maximum – that is, the maximum sentence allowed by statute, *see* 21 U.S.C.§ 846 (maximum term of life imprisonment), and does not constitute an upward departure from the Sentencing Guidelines.  *See United States v. McKinney*, 406 F.3d 744, 746-47 (5th Cir. 2005).  In addition, the Fifth Circuit has explicitly held that *Blakely/Booker* claims do not survive the type of Plea Agreement waivers at issue herein.  *See e.g, Bond*, 414 F.3d at 546; *Cortez*, 413 F.3d at 503; *United States v. Beaird*, 2005 WL

1767939 (5th Cir. 2005); *United States v. Trigg*, 141 Fed. Appx. 296, 297 (5th Cir. 2005); *United States v. Armendariz*, 138 Fed. Appx. 686, 687 (5th Cir. 2005).  To the extent that Nunez attempts to overcome the plea waiver by alleging ineffective assistance of counsel, the majority of Nunez' claims relate to Nunez's  dissatisfaction with the length of his sentence, and such claims are subject to the waiver and, in any event, are without merit as discussed below.   In contrast,  because Nunez, in this § 2255 proceeding alleges he made statements to Mr. McWilliams that might trigger either the *per se* duty to appeal or affirmative duty to consult with Nunez to determine his wishes as instructed by the United States Supreme Court in *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), his waiver of his right to appeal and to pursue a collateral attack does not preclude review.   Indeed, the majority of courts to consider the impact of waivers, in light of *Flores-Ortega*, have concluded that a waiver in a plea agreement does not defeat a claim of ineffective assistance of counsel for failure to file a notice of appeal when directed to do so by the defendant.  *See Campusano v. United States*, 442 F.3d 770 (2nd Cir. 2006); *Del Bosque v. United States*, (No. Civ. 05-4172, Cr. 04-40114), 2006 WL 288242 (D.S.C. Feb. 1, 2006); *United States v. Garrett*, 402 F.3d 1262, 1266-67 (10th Cir. 2005); *Sandoval-Lopez v. United States*, 409 F.3d 1193, 1197-98 ( 9th Cir. 2005); *Carrion v. United States*, (No. 03-3046) 107 Fed. Appx. 545, 2–4 WL 1859346 (6th Cir. 2004); *Heiss v. United States*, (No. 01-1139) 24 Fed. Appx. 599, 2001 WL 151882 (7th Cir. 2001).

Because Nunez's plea agreement,  and waiver of appeal and collateral rights contained therein, were knowingly, voluntarily, and intelligently entered, because Nunez has waived his right to bring a § 2255 motion, and because that waiver is valid and should be enforced, it serves as a bar to most of the claims raised by Nunez is his § 2255 motion, e.g., *Mason v. United States*, 211 F.3d 1065, 1069 (7th Cir. 2000); *Davila*, 258 F.3d at 451-52; *United States v. Nguyen*, 2005 WL 14090

(E.D. La. 2005); *Morua v. United States*, 2005 WL 1745474 (S.D.Tex. 2005) (Hittner, J.); *United States v. Rohmfeld*, 2006 WL 126636 (S.D.Tex. 2006) (Jack, J.).

Moreover, even assuming that Nunez's waiver did not serve as a bar, with the exception of his ineffective assistance of counsel claim relating to his appeal, which cannot be ruled on at this time, all of Nunez' ineffective assistance of counsel claims fail. Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had. *Strickland*, 466 U.S. at 687. Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable. *Id*. at 687-88. The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable. *Id*. at 694-95. Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief. The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *United States v. Seyfert,* 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*). To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have

been different.  "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel.  The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record.  Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984).   The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland,* 466 U.S. at 690.  "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)).  The court's role "under § 2255 is not to audit decisions that are within the bounds of professional prudence." *United States v. Molina-Uribe*,  429 F.3d. 514, 518 (5th Cir. 2005), *cert. denied*, (2006).  In addition, conclusory allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition. *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

With respect to guilty pleas, the prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).  Thus, Nunez "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* As to the specific examples of ineffective assistance of counsel which Nunez cites to in support of his ineffectiveness claims relating to his decision to plead guilty, such as that he was misled about

the length of his sentence, and those claims relating to sentencing, such as counsel's failing to move to withdraw his guilty plea and the timeliness of the objections to the PSR, and his consent to have substitute counsel appear at sentencing, the record either affirmatively shows that Nunez's counsel was not deficient or there is no evidence that the alleged errors prejudiced Nunez within the meaning of *Strickland*.

Nunez claims that the guilty plea was not knowing because it was based on counsel's misrepresentations about a sentence of ten years. According to Nunez, his counsel failed to discuss the case with him and failed to prepare for trial by filing motions such as a motion to dismiss indictment and other discovery motions. Also, Nunez alleges that counsel should have hired an investigator. According to Nunez, counsel urged him to take a plea, on the eve of trial, notwithstanding Nunez's protestation of innocence. Nunez contends that he would not have pleaded guilty had he known he would receive a life sentence. He further argues he pleaded guilty based on counsel's assurance that he would receive a three level reduction for acceptance of responsibility, and would not be charged with failure to appear. In addition, Nunez argues that his attorney told him not to worry about any questions posed by the Court at his Rearraignment because such questions were "simply standard operating procedure that was done in all cases, but that it did not specifically apply to me." (Document No. 396, Exhibit 1, ¶ 18). Nunez contends that because his counsel failed to spend anytime on his case, or to explain the law, he entered his plea with no appreciation of the consequences.

"Solemn declarations in open court carry a presumption of verity, forming a formidable barrier in any subsequent collateral proceeding." *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998) (quoting *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977)). However, a defendant such as Nunez may obtain habeas relief on the basis of misrepresentations as to what a sentence will

be, notwithstanding statements made in open court, by showing the exact terms of the alleged promise, when, where and by whom the promise was made, and the precise identify of an eyewitness to the promise. *Cervantes*, 132 F.3d at 1110 (citing *Harmason v. Smith*, 888 F.2d 1527, 1529 (5th Cir. 1989)). Consequently, absent independent evidence that disputes Nunez' own testimony which he gave during his Rearraignment, his ineffective assistance of counsel claims based on counsel's erroneous estimate of his sentencing exposure fails. Here, because Nunez has failed to come forward with credible, independent evidence, which would dispute his sworn statements at his Rearraignment hearing, his claims fail.

Moreover, regardless of whether Nunez' attorney knew of, or discussed with him, his relevant conduct and the application and effect of relevant conduct in calculating his sentence, and possible increases to his base offense level for his role in the offense and for obstruction of justice, given Nunez' sworn statements at his Rearraignment hearing, which are entitled to the presumption of truthfulness, Nunez has not shown that he was unaware that he could be sentenced to more than ten years. For example, at Nunez' Rearraignment Hearing, he acknowledged, under oath, that he could receive up to a life sentence. In addition, Nunez stated that no representations or promises had been made as to his sentence, that *only* the Court would determine his sentence he would receive after receiving and reviewing the PSR and objections made by Nunez to the PSR, and that he could not withdraw his plea if his sentence was more severe than he expected. Nunez repeatedly acknowledged that he understood that no one could tell him with specificity the length of sentence that would be imposed by the Court and that his sentence would be determined by the Judge *only*. Similarly, the written Plea Agreement stated he could receive a sentence of up to life imprisonment, that his sentence would be imposed in accord with the Sentencing Guidelines, that the Court could impose *any sentence* within the statutory maximum, that the sentence to be imposed was within the

discretion of the court, and that imposition of the maximum sentence would not be grounds to withdraw his plea.  As such, even if Nunez' counsel had erroneously represented that he would receive a sentence of ten years by entering into the plea agreement, Nunez, nonetheless, was aware when he entered into the Plea Agreement and at the time of his Rearraignment hearing, that his sentencing exposure was a mandatory minimum sentence of 10 years or 120 months, and  could be life imprisonment.  Contrary to Nunez's allegations, neither the written Plea Agreement nor the transcript of the Rearraignment Hearing refer to a ten year sentence.  The record shows that Nunez testified he agreed with the Government's summary of the terms of the plea, that he had gone over the agreement with his counsel and understood the terms thereof, had no questions relating to the agreement, and admitted to his guilt.

Given the exchange between Nunez and the Court at his September 16, 2002, Rearraignment Hearing, which leaves no doubt that Nunez knew he faced up to a life sentence, and the explanation of the sentencing process, and in particular, that his sentence would not be known until the sentencing hearing, simply because his counsel anticipated a substantially shorter sentence, Nunez has not shown prejudice within the meaning of *Strickland*. Nunez has failed to demonstrate that his guilty plea was not knowing, voluntary, and intelligent, and has likewise failed to overcome the presumption under *Strickland* that "counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. (quotations omitted).          Even if counsel had predicted a much lesser sentence, Nunez's reliance on that sentencing estimate would have been unreasonable given the numerous warnings he received at his Rearraignment that the maximum sentence for the drug conspiracy to which he was pleading guilty to was life.  By pleading guilty, Nunez had the potential for a less harsh sentence

given that there was a chance for a reduction for acceptance of responsibility, the dismissal of the criminal forfeiture, dismissal of the criminal indictment in H-91-61, and that he would not be charged with being a fugitive.  In contrast, had Nunez gone to trial, it is highly likely that the jury would have found him guilty, based on the evidence, and there would have been no chance of a reduction for acceptance of responsibility, he would likely have been charged with being a fugitive, the criminal case in H-91-61 would have gone forward, and his property would have been forfeited. Overall, by pleading guilty, Nunez had the possibility of limiting his sentencing exposure.

As to Nunez' allegations that he received ineffective assistance of counsel because counsel failed to discuss the case with him, prepare for trial by filing motions and failed to hire an investigator, Nunez does not provide any details about what his counsel should have investigated or what such investigations would have revealed.  Because Nunez offers no more than conclusory statements, his ineffective assistance of counsel claim fails.  *See United States v. Green*, 882 F.2d 999, 1003 (5th cir. 1989) ("A defendant who alleges a failure to investigate on the part of counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.").  Here, upon this record, Nunez has not raised any specific facts that would show prejudice as a result of his counsel's failure to investigate.

As for Nunez's ineffective assistance of counsel claims relating to sentencing, such as counsel's failure to move to withdraw his guilty plea, Nunez has not identified a viable basis for such a motion.  Counsel is not effective for not filing a frivolous motion.  Counsel is not "deficient for failing to press a frivolous point."  *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995).  Likewise, counsel is not required to make futile motions or objections desired by his client.  *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990), *United States v. Gibson*, 55 F.3d 173, 179 (5th Cir. 1995).

As to Nunez's contention that he did not voluntarily consent to the representation of Mr. McWilliams at sentencing, the docket sheet reveals that Nunez signed his entry of appearance and voiced no concern about Mr. McWilliams' representation at the Sentencing Hearing, despite being given the opportunity to do so.

With respect to Nunez's allegations concerning the timeliness of the objections to the PSR, regardless of whether the objections were timely or not, the record shows that Judge Harmon was familiar with the objections to the PSR which had been filed, and of the Motion for Downward Departure.  The record further shows that Mr. McWilliams argued for a lesser sentence comparable to that of Nunez' co-defendants.   Because counsel's performance was not deficient and there was no resulting prejudice within the meaning of *Strickland*, no relief is available on these ineffectiveness claims.

Lastly, as to Nunez's claim that he requested counsel to file a notice of appeal, Nunez' affidavit states in pertinent part:

> 23.  Needless to say, when I heard Judge Harmon pronounce a life sentence, I truly wanted to die on the spot.  Subsequent to the sentencing and before I was taken back to jail, I asked attorney Edwin Dee McWilliams if there was anything that I could do and he said no–I asked him to please file a motion to preserve my appellate rights because I know my family would try and find me the best appellate attorney, but Edwin Dee McWilliams turned to me and told me that "I needed to blame by previous attorney because he waived my appellate rights." I almost fainted when I heard this.

The law is clear that "[t]he failure to file a requested notice of appeal is ineffective assistance of counsel even without a showing that the appeal would have merit."  *United States v. Alvarez*, (No. 04-40350), 172 Fed. Appx. 587, 588 (5th cir. 2006) (citing to *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000).  To establish prejudice, a defendant such as Nunez must demonstrate only that there is a reasonable probability that but for counsel's failure, he would have appealed.  *Flores-Ortega*, 528

U.S. at 486.  Here, the docket sheet shows that  Notice of Appeal was not filed, either *pro se* by Nunez or by counsel.  In addition, the docket sheet shows that counsel did not file a Motion to Withdraw or an *Anders* brief.[5]  Based on this record, which consists of Nunez' sworn affidavit, which has not been rebutted by the submission of a detailed affidavit and supporting documentation by the Government, the record does not conclusively show that Nunez is entitled to no relief on this claim.  As such, the undersigned Magistrate Judge recommends that an evidentiary hearing be held to clarify the facts underlying Nunez' claim that he requested counsel to file a notice of appeal.

### III.  Conclusion and Recommendation

Based on the foregoing, it is

RECOMMENDED that Movant's Motion Requesting Leave to Amend § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 399) be GRANTED, Movant's Motion Requesting Leave to Supplement § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 403) and Movant's Motion Requesting Leave to Supplement § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 418) both be DENIED, the Government's Motion for Summary Judgment (Document No. 412) be GRANTED on all claims except for Movant's ineffective assistance of counsel claim concerning his request to counsel to file a motion to preserve his appellate rights.  As to that claim, it is FURTHER RECOMMENDED that the Court

---

[5] Under the holding of *Anders v. California*, 386 U.S. 738, 744 (1967), the Supreme Court outlined the steps counsel should take when seeking to withdraw from representing a criminal defendant on appeal.  According to *Anders*, counsel must conduct a "conscientious examination of the case before seeking permission to withdraw from a case.  That request must be accompanied by a brief to the appellate court referring to anything in the record that might support the appeal."  *Id.*  Then, the appeals court reviews the record to determine whether the case is "wholly frivolous."  *Id.*

appoint counsel and hold an evidentiary hearing to determine whether Movant instructed his lawyer to file an appeal and his counsel failed to do so.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.   Within 10 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas.   Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc).   Moreover, absent plain error, failure to file objections within the ten day period bars an aggrieved party from attacking conclusions of law on appeal.   *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).   The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 25th  day of  September, 2006.



Frances H. Stacy
United States Magistrate Judge